UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DHIP, LLC f/k/a DREXEL HAMILTON INVESTMENT PARTNERS, LLC,<br><br>                              Plaintiff,<br><br>              -against-<br><br>FIFTH THIRD BANK,<br><br>                              Defendant. | 19 Civ. ____( )<br><br>**COMPLAINT**<br><br>**Jury Trial Demanded** |

Plaintiff DHIP, LLC f/k/a Drexel Hamilton Investment Partners, LLC, by and through its undersigned attorneys Dunning Rievman & Davies LLP allege as follows:

## NATURE OF THE CLAIM

1.      This is an action for damages arising from Fifth Third Bank's breach of its commitment to provide a fully collateralized business line of credit, resulting in the total and permanent impairment of Plaintiff DHIP, LLC (formerly known as Drexel Hamilton Investment Partners, LLC) ("DHIP"), a Service Disabled Veteran Owned Small Business investment management company registered with the Department of Veterans Affairs and Securities and Exchange Commission.   Over the course of five months, Fifth Third engaged in a course of deception and delay, repeatedly assuring DHIP that all material terms of the loan agreement were agreed to and promising that the transaction would be closing imminently.

2.      Indeed, Fifth Third cited its "special commitment" to veterans and veteran-owned businesses in convincing DHIP to terminate its discussions with another bank regarding a comparable loan.  Fifth Third prides itself on showing its appreciation and gratitude for veterans and soldiers through fundraising efforts and events, special banking privileges to current and

former U.S. Military, and, in the case of businesses like DHIP, mentoring or protégé relationships with veteran-owned businesses and their principals.

3.      Several months into the loan process, on or about May 9, 2013, Fifth Third informed DHIP's that each of the then-members would need to have "skin in the game" by personally guaranteeing the line of credit.  Then, in early June 2013 Fifth Third demanded full cash collateral instead of just a guarantee, and promised that the loan would be a "slam dunk" once the collateral was in place.

4.      DHIP raised the collateral by having James Abate deposit collateral and by having its then-members collectively pledge their shares to induce an affiliated party to provide the remaining collateral. In reliance on Fifth Third's promise to provide the line of credit, DHIP had represented to the Board of Directors of the mutual funds for which DHIP was the investment adviser (the "Funds") that DHIP would execute on a plan for growth to gain economies of scale in the Funds and maintain a high quality, adequately resourced nature of advisory services to the Funds.

5.      After being strung along by Fifth Third for months, Mr. Abate, leveraging a personal business connection on behalf of DHIP, contacted another lender to seek an alternate route to obtain financing.  Fifth Third induced DHIP to abandon its efforts with the other lender, again assuring DHIP that Fifth Third would provide the line of credit and would make numerous additional opportunities available to DHIP and its young, rapidly growing veteran-owned business. In reliance on these representations by Fifth Third, DHIP informed the alternative lender that it would not be pursuing financing from it, but would instead rely entirely on Fifth Third.  Here again, Fifth Third induced DHIP to rely on it and risked the very continued existence of DHIP's business.

6.      In the end, after agreeing on all essential terms of the line of credit agreement, and stringing along DHIP for months, Fifth Third suddenly went silent on the evening of the long-awaited closing.  After Fifth Third promised the application would be a "slam dunk," induced DHIP to stop seeking alternative financing, and even sending DHIP an email stating that "legal is complete, closing is imminent" and "this is done," Fifth Third reneged on its agreement – by text message – and never issued the loan.  As a result of Fifth Third's deliberate misrepresentations and DHIP's reasonable reliance on them the Service Disabled Veteran Owned Business lost its business and its first mover position.

7.      Although entirely hidden from DHIP and its members, the tenor of the internal conversation among Fifth Third employees about the prospects of DHIP's application was entirely different from what Fifth Third communicated to DHIP.  The depth of Fifth Third's duplicity was revealed to DHIP only through discovery in a related action, exposing that while that Fifth Third was telling DHIP that the deal was "done" Fifth Third's internal conversations showed, at various times, hostility, dismissiveness, serious objections from senior bank officers whose approval was required as well as Fifth Third's fixation on the prospect of hosting DHIP's valuable custodial accounts. Furthermore, discovery in the related action revealed that nearly all personnel at Fifth Third involved in the DHIP matter were subsequently terminated, demoted, or retired from the bank which begs the question of Fifth Third's own internal assessment of its actions related to the DHIP matter.  DHIP likewise relied on the absence of these highly material omissions, the existence of which would have revealed Fifth Third's myriad false representations.

## PARTIES

8.     Plaintiff DHIP, formerly known as Drexel Hamilton Investment Partners, LLC is a limited liability company organized under the laws of the Commonwealth of Pennsylvania, with its principal place of business in New York.  The sole member of DHIP is the Partnership to Seek Remedy Against Fifth Third Bank (the "Partnership"), which has its principal place of business in New York.  The partners of the Partnership are D. Wayne Robinson, a citizen of Georgia; Andrew Bang, a citizen of New York; and James Abate, a citizen of New Jersey.

9.     Upon information and belief, Defendant Fifth Third Bank ("Fifth Third") is an Ohio corporation with its principal place of business in Cincinnati, Ohio.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, as this is a civil action between diverse parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

11.     Defendant Fifth Third is registered to conduct business in New York.

12.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2).

## PROCEDURAL HISTORY

13.     DHIP's former members James Abate, Andrew Bang and D. Wayne Robinson brought an action against defendant Fifth Third Bank on December 23, 2013, entitled *Abate et al v. Fifth Third Bank*, 13 CV 9078.  After discovery was complete, the Court dismissed all of plaintiffs' claims on summary judgment, ruling that all claims belonged to DHIP rather than to those plaintiffs. The *Abate p*laintiffs subsequently moved to vacate the judgment under Rule 60 and for leave to amend their amended complaint to include DHIP as plaintiff pursuant to Rule 15. As of the time this complaint, these motions remain *sub judice*.

## BACKGROUND

### DHIP Was a Service Disabled Veteran Owned Small Business Poised for Explosive Growth

14.     DHIP's former members D. Wayne Robinson, Andrew Bang, James Abate, and Jack Jacobs are all military veterans.

15.     Mr. Robinson is a service disabled military veteran and retired Command Sergeant Major, U.S. Army.  He received over 39 awards and commendations during his time in the Army.

16.     Mr. Abate is a former commissioned officer, U.S. Army. He is an experienced fund manager and financial services professional, having been employed at Centre Asset Management LLC ("Centre"), GAM, Credit Suisse and PricewaterhouseCoopers as a Managing Director, Fund Manager, or Manager.  At the time Mr. Abate was a member of DHIP, he also had a minority membership interest in Centre, and, through a consulting agreement, served as an unpaid director and administrator for Sanlam International Investments USA Holdings, Inc.

17.     Mr. Bang is a former commissioned officer, U.S. Army, who has wide experience in asset management and financial services at UBS and GE, and who formerly served as a Vice President at AIG Global Investments and as a Senior Vice President at Shinan Investments America.

18.     In November 2010, DHIP, an Investment Manager with expertise in asset allocation and manager selection, was formed by Mr. Bang and Mr. Abate along with other members, including those who worked for Drexel Hamilton, LLC, an institutional broker-dealer, all of whom were veterans and some of whom were service-disabled military veterans.  In December 2011, Mr. Robinson came on as head of Institutional Business Development and member.

19.     In January 2012, the DHIP former members that remained associated with Drexel Hamilton, LLC divested their ownership in DHIP due to regulatory conflict with being dually associated with a registered investment adviser and broker-dealer.

20.     In February 2012, Jack Jacobs, another DHIP former member who is a retired former commissioned officer (rank of Colonel) and highly decorated (Congressional Medal of Honor recipient) service disabled military veteran, U.S. Army, who had wide experience in asset management and financial services with Bankers Trust and Lehman Brothers joined as a member and Chairman.  At this time, DHIP and this Col. Jacobs established a "Heroes and Service Trust," enabling it to better offer meaningful employment and ownership opportunities to disabled veterans desiring a career in investment management with DHIP.

21.     Upon information and belief, DHIP was the first Department of Veteran Affairs registered (and pending verification) Service Disabled Veteran Owned Small Business to be registered with the Securities and Exchange Commission as an investment adviser and the first to offer its services as the investment adviser to a registered and regulated series of mutual funds.

22.     As of December 21, 2011, DHIP had launched and was managing a series of public, regulated mutual funds.

23.     As a first mover in this area of Disabled Veteran Owned investment management, DHIP was poised for explosive growth: within a mere 18 months of launching its Funds, DHIP had $200 million in assets under management from institutions and other investors.

24.     DHIP's rate of growth was no less impressive.  Prior to its destruction by Fifth Third, its principals projected that its assets under management would rise exponentially to well in excess of $1 billion within three to five years.

25.     Industry valuation metrics indicated a fair market value of DHIP's equity – just prior to the time Fifth Third destroyed it – of approximately $17.5 million and as high as $50.1 million.

**Fifth Third Pursues a Relationship with DHIP**

26.     In or about September 2012, DHIP's D. Wayne Robinson and Edward Schrank, a Vice President at Fifth Third with responsibility for disabled veteran outreach, held an initial meeting regarding DHIP, having met through veteran-related events.

27.     Like Mr. Robinson, Mr. Schrank is a service disabled military veteran.

28.     Mr. Schrank wanted to discuss a relationship between Fifth Third and DHIP because the bank was planning to launch a group dedicated to veteran-owned businesses.

29.     Mr. Schrank began actively pursuing and soliciting DHIP to form an alliance with Fifth Third.

30.     On or about October 25, 2012, Messrs. Abate, Bang and Robinson attended an introductory meeting in Chicago with Mr. Schrank, to discuss DHIP's background, capabilities, and products.

31.     During this meeting, Mr. Schrank again expressed Fifth Third's interest in developing a long-term relationship with DHIP.

32.     Through the remainder of 2012 and early 2013, Mr. Schrank gathered information about, and did due diligence on, DHIP, speaking to Mr. Robinson from time to time.

33.     Fifth Third and Mr. Schrank continued to court DHIP, inviting Mr. Robinson to a "DHIP mentoring discussion" over lunch on February 11, 2013.  Specifically, Fifth Third told DHIP that it wanted to showcase DHIP as a "marquee client" for their forthcoming veteran's initiative.  Fifth Third proposed that eventually DHIP would utilize Fifth Third for custody

services, meaning that Fifth Third would become the custodian of DHIP's mutual funds and considerable assets under management and, to further its their business further.  Mr. Schrank said that getting a loan from Fifth Third would be a formality, or the "first step" that would get DHIP "in the door" to establish this "Mentor-Protégé" relationship and gain further and broad-based access to cooperative Fifth Third executives at the highest level to assist in DHIP's growth.

34.     DHIP reasonably relied on Mr. Schrank's assurances that it would be a mere formality for DHIP to get a loan from Fifth Third and Mr. Schrank's promise that Fifth Third would showcase DHIP as a "marquee client" for their forthcoming veteran's initiative, establish a "Mentor-Protégé" relationship and gain further and broad-based access to Fifth Third executives at the highest level to assist in DHIP's growth.  DHIP presented this opportunity to the Board of Directors and the Board of Trustees of the Funds.

35.     Mr. Shrank invited Mr. Robinson to attend a February 25, 2013 event at the Pritzker Military Library in Chicago, at which Fifth Third announced its Military Business Resource Group ("Military BRG"), an initiative and commitment to veteran-owned businesses to be headed by Mr. Schrank.  At this meeting, Mr. Robinson was introduced to many members of Fifth Third's senior leadership.

36.     Upon information and belief, Fifth Third's Military BRG was part of Fifth Third's outreach to current and former U.S. Military.  Fifth Third offers various special banking privileges, and heads community outreach initiatives aimed at showing its appreciation and gratitude for veterans and soldiers.

37.     Fifth Third and its Military BRG continued to pursue DHIP.  On or about March 7, 2013, Mr. Robinson met in Chicago with Joseph Carter, a former Army Captain and senior vice

president and co-chair of the Military BRG at Fifth Third.  Mr. Carter, at and subsequent to that meeting, reiterated Fifth Third's strong interest in working with DHIP.

### Fifth Third Accepts DHIP's Loan Request, and Strings Along DHIP for Months

38.     Following these Chicago meetings, in or about March 2013 Mr. Robinson and Mr. Schrank began discussing opening a business revolving line of credit ("RLOC") for DHIP.  Mr. Schrank told Mr. Robinson that the process would take only a couple of weeks to complete.

39.     The RLOC under discussion was a standard Fifth Third product sold to its business customers.  The RLOC had standard terms and conditions for all customers.

40.     DHIP needed the RLOC to repay an existing loan that was due and payable on May 31, 2013, for operating capital for daily business operations, and for growth capital for its continuing expansion.  For instance, DHIP planned to hire another disabled veteran for fund sales and business development and was preparing for a launch of a new fund series and share classes to complement the existing series of Funds.

41.     On or about March 15, 2013, DHIP held a conference call with Fifth Third's Private Bank during which DHIP gave a presentation regarding DHIP's capabilities and financials, the parameters of the "Mentor-Protégé" relationship between Fifth Third and DHIP, and the exact uses for the RLOC that DHIP requested.

42.     As of this date, March 15, 2013, Fifth Third knew that DHIP was looking for a loan for DHIP for repayment of an existing line of credit, to meet other existing obligations, as well as for working capital and operating expenses to fund the expansion of its business, including the hiring of additional service disabled veterans to bolster its fund management, distribution and operating resources.

43.     As of about March 28, 2013, weeks after Fifth Third and DHIP began to discuss the RLOC, Mr. Schrank expressed to Mr. Robinson that he had about 80% informal approval from Fifth Third's office of financial institutions to extend an unsecured RLOC to DHIP.

44.     On or about April 25, 2013, after extensive discussion between DHIP, Mr. Schrank, and Mr. Carter about the terms of the loan and DHIP's business, Mr. Schrank told DHIP that he had submitted DHIP's formal loan request to a team led by Patrick O'Connell, another vice president at Fifth Third,:"Your LOC goes into process today."   Mr. Schrank stated that he expected approval of and closing on the RLOC within one week. This loan request was for a RLOC of $800,000, to be secured fully by DHIP's creditor, Centre Asset Management ("Centre"), through a letter of credit or third-party guarantee.

45.     On or about May 9, 2013, a conference call was held between Mr. Schrank, Mr. O'Connell and DHIP regarding the terms of RLOC.  On this call, for the first time, Mr. O'Connell told DHIP that they had to personally provide security for the RLOC, as Fifth Third was requiring each of DHIP's then-members to have "skin in the game" in order for Fifth Third to make the loan. According to Mr. O'Connell, Fifth Third believed that a guarantee by DHIP or its creditor, Centre, each being limited liability entities, was not adequate.

46.     During the May 9, 2013 conference call, DHIP agreed to obtain the required amount of security guarantee.  However, Mr. Bang and Mr. Robinson stated during the call (and  Mr. Abate confirmed subsequent to the call) that they were unable to provide security for the loan personally, and therefore DHIP was forced to pursue other means of getting the security. During the call, Mr. Abate expressed to Fifth Third that he could potentially provide partial security, though financially stressful to him, as well as seek out a third-party provider of security for the remainder.

47.     During the May 9 conference call, the parties agreed to the financial terms of Fifth Third's standard RLOC in the amount of $900,000, fully secured and guaranteed, with payments of interest only, a one-year term subject to renewal, at an interest rate equal to the prime rate minus 50 basis points.

48.     All parties understood that the loan was subject to Fifth Third's standard documentation. At the time of these discussions, a copy of such terms and conditions was publicly available on Fifth Third's website.

49.     Due to the Fifth Third's representatives' communications that the RLOC would be funded imminently, DHIP induced Centre, DHIP's lender, to agree to a period of forbearance on the loan and modified its maturity date to June 30, 2013.   Additionally, in reliance on the representations that the RLOC would be funded imminently, DHIP represented to the Board of Trustees for the Funds, on or about May 23, 2013, that DHIP would be able to execute its growth plan.

50.     Although all material terms had been agreed upon in early May 2013, and although Fifth Third told DHIP that the loan would take only a few weeks to complete, by June 2013 little progress had been made towards closing of the RLOC.   DHIP pressed Mr. Schrank as to the status of the RLOC at least on a weekly basis, as the money was needed by the end of June to repay the Centre loan as well as for operating and growth working capital.

51.     On May 22, 2013 and June 3, 2103, Mr. Schrank sent internal Fifth Third emails about the opportunity presented by DHIP's custodial accounts.

52.     On June 5, Mr. Robinson conveyed to Mr. Schrank the direness of DHIP's financial situation because of Fifth Third's delay in an email stating, in part:

Good Afternoon. In reaching out to 5/3rd back in March to apply for a loan under the Business Resource Group's outreach to veteran owned business, my partners and I weren't aware that this would take 3 months. . . . We are fast approaching an almost 12 week period of processing. *During this time period our resource status has changed from light green to bright yellow*." [Emphasis added].

53.     In response, Mr. Schrank continued to assure DHIP that everything was on track in order to dissuade DHIP from seeking financing elsewhere.

54.     Nobody told DHIP that on June 3, 2013 Mr. O'Connell told Mr. Terborg that he was "not sure these are clients I'd want to work with."

55.     On or about June 6, 2013, Mr. Schrank conveyed to Mr. Robinson for the first time that the loan would need to be fully collateralized with 100% compensating cash balance held at Fifth Third.  DHIP was surprised by this news, but still intent on securing the loan.  Mr. Schrank told DHIP that with this newly requested 100% collateralization, the loan was a "slam dunk."

56.     DHIP continued to press Fifth Third at least weekly about the status of the loan. For example, on June 17, 2013 Mr. Robinson informed Mr. Schrank that DHIP would like to be in a position to close on the RLOC this week.  Neither Mr. Schrank nor anyone else from DHIP informed Mr. Robinson or anyone else from DHIP that Fifth Third had not even submitted the loan application, nor that Mr. Schrank' s superiors Mr. O'Connell and Mr. Kozak had not heard anything about DHIP for weeks, nor that Mr. O'Connell wrote to Mr. Terborg that he had "passed on this deal twice now."

57.     On June 26, 2013, the parties' agreement regarding the terms of the RLOC was confirmed on a second conference call between Fifth Third's Mr. Schrank, Patrick O'Connell, and Steven Terborg and DHIP.

58.     Mr. O'Connell confirmed the parties' agreement, but stated that while the interest rate would be roughly equivalent to prime minus 50 basis points, it would be expressed in terms

of the equivalent LIBOR-based rate.   Mr. O'Connell stated that this cosmetic change was necessary because the RLOC product had standard terms.

59.     On or about July 3, 2013, Mr. Robinson emailed Mr. Schrank "in the interest of moving the process along as fast as possible."   Mr. Robinson was puzzled by some paperwork from Fifth Third in which Fifth Third appeared to still be requesting personal collateral from each of the then-members of DHIP.   He took this opportunity to reiterate and ensure that Fifth Third understood fully that the collateral was being provided not by all the members but by Mr. Abate and by a third party.

60.     On or about July 9, 2013, Fifth Third confirmed by telephone that the RLOC would be issued to DHIP subject to a cash guarantee as collateral and stated that it expected approval and funding within 48 hours.

61.     Following the call, on the night of July 9, Mr. Schrank emailed Mr. Robinson, and confirmed that the line of credit being applied for was $900,000, $600,000 to be secured by a third party and $300,000 in cash (from Mr. Abate), which all parties had agreed to and which Mr. Shrank had represented would be a "slam dunk" more than one month earlier.   Mr. Robinson responded the next day, asking for account opening documents for the collateral.

62.     Once the parties agreed to the terms of the cash collateral, all material terms of the contract by which Fifth Third agreed to provide the RLOC to DHIP were agreed.

63.     By mid-July 2013, progress still lagged, despite DHIP's numerous inquiries about the status of the RLOC.   These inquiries were all met with assurances from Fifth Third that the RLOC would be approved.

64.     Yet nobody from Fifth Third told DHIP that on July 10, 2013 Mr. Terborg told senior bank officers that "I am going to end this charade and tell them we are not interested in working with them" and told Mr. O'Connell that "we have played this game long enough."

65.     Nor did Fifth Third tell DHIP that on July 11, 2013, Fifth Third Business Banking leader and senior vice president Timothy Doyle replied, "I am out."

66.     Instead, during this period, Mr. Schrank and Mr. Doyle, Mr. Schrank's supervisor, repeatedly represented to DHIP that the RLOC would be approved.  In reliance on these false assertions, DHIP continued to execute on its well-articulated plan for growth of advisory services and expanding its capabilities to include now moving formally ahead with the costly organizational undertaking of launching another mutual fund to complement its existing stable of fund offerings.

67.     Then, on or about July 17, 2013, Mr. O'Connell promised Mr. Abate by email that he would send a commitment for him to review "shortly," and assured him that because the loan was fully collateralized,  there was no approval risk because "we are not underwriting based on performance on these [requested financial documents] since we have the collateral we have . . . ."

68.     Also on July 17, in response to Mr. O'Connell's July 17 email, Mr. Abate reminded him of DHIP's need for immediate funding.

69.     Yet, further delay ensued.  Again, on July 23, DHIP reiterated its need for funding by July 25, the end of the week, and Mr. O'Connell advised that the DHIP loan process was "bumped to the front of the line" and that "[t]his should be wrapped up this week."  Once again, Fifth Third promised the loan would be approved and disbursed within 48 hours.

70.     As of July 25, 2013, Fifth Third had still not provided instructions to activate the accounts to deposit the loan collateral, despite numerous requests by DHIP to open and fund the accounts.

71.     Fed up with the unexplained delays, Mr. Abate told Mr. Schrank that he was discussing alternate financing with J.P. Morgan despite the myriad of promised benefits which would accrue to DHIP and its members from the Mentor-Protégé relationship with Fifth Third. DHIP's financial condition and doubt about its ability to execute its plans for intended growth and distribution initiatives was becoming an increasing issue of concern to the mutual fund Board of Trustees.  The need for DHIP to obtain financing was paramount.

72.     On July 25, following a conversation with J.P. Morgan regarding obtaining a loan there, Mr. Abate received an email from J.P. Morgan providing the account-opening documentation for a savings account that would hold a portion of the collateral for a loan issued by J.P. Morgan, and account opening documents for a DHIP business checking account with J.P. Morgan.

73.     Mr. Schrank called Mr. Abate that same day, July 25.  During this and another call that day, Mr. Schrank instructed Mr. Abate not to pursue funding with J.P. Morgan, promising that Fifth Third's dedication to veterans and military families presented DHIP with greater opportunity than any other lender would, and that Fifth Third would showcase DHIP as the principal military veteran-owned business partner under Fifth Third's "Diversity Blueprint" and community support programs.

74.     Mr. Schrank also reassured Mr. Abate that Fifth Third, along with Messrs. O'Connell and Doyle, were "committed to DHIP" and that once DHIP became a loan customer of Fifth Third, avenues for cooperation and assistance between DHIP and Fifth Third would exist at the highest executive level.  He promised that DHIP would receive attention and priority to include investment into the funds advised by DHIP as well as distribution support.  Mr. Schrank advised that Fifth Third needed just one more day to complete their internal processes.

75.     In reliance on Mr. Schrank's representations in paragraphs 73 and 74 above, Mr. Abate terminated DHIP's discussions with JP Morgan.  In breaking off discussions with JP Morgan (which had immediately provided the account-opening documents that had been so difficult to get from Fifth Third), DHIP put all of its eggs in the Fifth Third basket.

76.     On July 26, 2013, in reliance on Fifth Third's assurances that the closing was imminent, DHIP ensured that the required Loan Cash Guarantee of $600,000 was deposited in a Fifth Third account to serve as partial collateral for the RLOC.  This collateral was secured at great personal cost to DHIP's then-members in reliance on the assurance that Fifth Third Bank would not have to underwrite for performance, and other representations of Mr. Schrank that Fifth Third Bank would provide the RLOC, as well as the advantages set forth in paragraphs 73 and 74, above.

77.     Mr. O'Connell told Mr. Bang by email that he was pushing "to have closing docs today [July 26]," which again did not happen.  Mr. O'Connell then said "[w]e are on track to have closing documents on Monday [July 29]."

78.     On Monday July 29, a $300,000 personal check from Mr. Abate (which had been mailed on Friday, July 26) was deposited in a Fifth Third established bank account. This was the additional personal loan cash guarantee to be used as collateral for the loan at great personal cost to Mr. Abate.

79.     Thus, the $900,000 loan was fully collateralized, satisfying any condition precedent to the finalization of the loan by Fifth Third.

80.     However, Mr. O'Connell continued to stall, assuring Mr. Bang by email on the afternoon of July 29 that he had been "hounding our document folks all day, will know shortly [if Bang could expect closing documents that day]."

81.     Mr. Terborg asked the credit department on July 30 if it was possible to have "docs issued by this afternoon."

82.     On July 30, 2013, Jason Smith responded to Messrs. Terborg, Doyle, O'Connell and Schrank that there was "no way we would be able to obtain SCO approval, complete due diligence, and be able to fund today.  Understand that this is cash-secured but it is also an 11 PD and doesn't cash flow.  I have no idea what direction SCO will go on this so I am not comfortable providing a direction at this time."

83.     Upon information and belief, PD stands for probability of default.

84.     Senior Credit Officer ("SCO") Debbie Huffman had rarely seen an application with a PD of 11 because normally "it would have been declined prior to getting to me."

85.     Over the next two weeks, DHIP continued to inform Fifth Third that they could not wait any longer for the funding.  For example, on August 1, 2013 Mr. Bang wrote to Mr. Schrank, "Paperwork done tomorrow and $$ wired on Monday??? (please) Obviously, we need it ASAP…."

86.     Mr. Schrank and Mr. O'Connell continued to string DHIP along with double talk and requests for documents that Fifth Third Bank already had or hardly needed, given that, as Mr. O'Connell wrote back on July 17, 2013 the bank was "not underwriting for performance, since we have the collateral we have."  Nonetheless, DHIP provided all of the requested documentation promptly, as they had during the entire process.

87.     On July 31, Ms. Huffman raised a number of questions to credit officer Mr. Ottinger, including concerns about the $900,000 of collateral, the ownership of Sanlam and whether it approved the pledge.  Ms. Huffman also asked why something called the subjective credit model was not used.

88.     Despite this, on August 1, 2013, Mr. Schrank falsely told DHIP that the Senior Credit Officer ("SCO"), whose approval was necessary for the loan, had "signed off."  Discovery in the related action showed that she had not signed off and never signed off.

89.     And neither Mr. Schrank nor anybody else from Fifth Third told DHIP that credit had no idea which way SCO would go, or how long it would take of that their application had been assigned a PD score of 11, nor that such an application would normally be rejected before it got to SCO.

90.     Nobody from Fifth Third told DHIP that Mr. O'Connell had told Mr. Smith on July 30 that Mr. Schrank was new to banking and did not "realize what it takes to put money out the door at the bank, even with security" nor that he had been "unrealistic all the way."

91.     On August 5, 2013 Mr. Bang again wrote to Mr. Schrank that "the continual and unending delay is totally unsatisfactory and has had a severe and costly impact on our business." The loss of DHIP's credibility with the Fund's Board of Trustees, service providers to the Funds, and affiliated party loan guarantor was escalating.

92.     On August 5, 2013, Mr. Schrank wrote that on his call with the SCO that afternoon he would lead with "the value add of the custodial account" and "profile becoming the keystone of our veteran efforts."

93.     In complete contradiction to his multiple representations to DHIP, Mr. Schrank astoundingly admitted in discovery in the related action that Fifth Third had no veterans' initiatives, other than a Veterans Day event that involved sending care packages to active duty personnel.

94.     On August 6, Mr. Schrank wrote to DHIP that he "got the legal component solved today" Fifth Third's legal department needed a letter stating the benefit that Sanlam, the company

related to Centre that provided the $600,000 in collateral, was receiving for pledging the $600,000 in collateral, apparently so that Fifth Third could ensure that all the then-members of DHIP had the required "skin in the game".  Mr. Abate promptly responded by sending the letter requested by Mr. Schrank summarizing the then-members' agreement with Sanlam as well as the Sanlam board resolution authorizing such and then followed up with another email on August 9, also at Mr. Schrank's request, with a copy of this agreement signed by the individual DHIP members (as previously detailed in the requested letter).

95.     On the morning of August 8, Mr. O'Connell emailed DHIP asking if it wanted to fund at closing or draw at a later date, and with closing instructions.  He stated: "I will email you the doc for signature. You can sign and email back.  We can close and fund with electronic copies.  Please send originals to my address below.  I anticipate having documents to send you by this afternoon."

96.     Mr. Bang promptly responded by email, on August 8 instructing Fifth Third to fund immediately at closing, and promising to review, sign and return the documents quickly.  In reply, Mr. O'Connell wrote, at 10:49 am: "[s]tay tuned, we should have docs shortly."  The afternoon of August 8 he wrote to Mr. Bang: "We are close [with the documents].  All hands are on deck to get them out the door."  The documents were not sent on August 8, nor on Friday August 9.

97.     Three hours after his email to DHIP, O'Connell emailed a credit officer to inquire if the SCO had even input her comments.

98.     On the evening of August 8, Mr. Doyle chastised Ms. Huffman, the SCO, who had raised, at this late date, issues with DHIP's application.  "At this point I do not understand the reasons for the delays.  We have to catch these issues on the front end to avoid the disruption that this kind of delay causes between the bank and employee and customer."

99.   The next morning, August 9, 2013, reacting to Ms. Huffman's concern about the collateral documents and Fifth Third employees' failure to comply with her "original requirement" for "the review and warranting of the collateral documents by legal counsel," Mr. Doyle told Mr. O'Connell, Mr. Terborg, Ms. Huffman and others "I am ready just to move on with a no here."

100.   Nobody ever reported this to DHIP, which was left to believe that wires were to be sent out imminently on August 8.

101.   On August 9, as SCO, Ms. Huffman placed conditions for approval on DHIP's application, which O'Connell misrepresented to DHIP as "some wrangling in our legal with the verbiage in the pledge resolution from Sanlam.  We are almost there."

102.   Not five minutes later on August 9, Mr. Terborg wrote to Mr. Schrank and Mr. Doyle listing items they now desired from DHIP and said "I would reset expectations that documents are a week away because 'Legal' will have to review our collateral documentation."

103.   This reset of expectations was never attempted.

104.   That same day, Mr. Shrank was discussed the value of DHIP's custodial accounts with employees in Fifth Third's Global Securities Services.

105.   On August 12, 2013, Ms. Huffman and a Fifth Third lawyer raised concerns about the facts that were not previously raised to them and Ms. Huffman asked why these facts were not known earlier.  Fifth Third credit officer Phillip Ottinger replied that "between the field and the BLC a of information and questions that are normally a part of the loan process did not take place."

106.   Later on August 12, a Fifth Third attorney informed Mr. O'Connell and Mr. Ottinger that the structure employed potentially created a concern that some party could claim a of a fraudulent conveyance and as such that the Credit department needed to get comfortable with the structure. This email was forwarded to Mr. Schrank.

107.   Instead of resetting expectations, or informing DHIP of these new concerns,  on Monday August 12, 2013, with the collateral in place since July 29, and after weeks of false starts and broken promises, Fifth Third's Mr. Schrank wrote this bald-faced lie to DHIP: "legal is complete, closing is imminent based on credit telling doc team to release.  Credit was waiting on legal so *this is done*." (emphasis added).

108.   Based on the representation that "this is done," DHIP decided not to withdraw their collateral and seek alternative financing from another lender, as Mr. Abate had wanted to do the previous Friday August 9.

109.   But the RLOC was not "done" on August 12, nor ever.  On August 13, Huffman informed Mr. Terborg and Mr. O'Connell that "Fifth Third will not be moving forward with the transaction" and that they should communicate with the borrower.

110.   Fifth Third did not communicate this to DHIP.

111.   On August 14, Mr. Schrank asked Mr. Robinson for two years of financials for Sanlam, which DHIP sent to him that same day.

112.   In the days after Mr. Schrank wrote that the RLOC was "done," Fifth Third Bank abruptly stopped communicating with DHIP.

113.   On August 15, 2013, as a direct result of Fifth Third's failure to provide the RLOC, which was "done" on August 12, compounded by the failure of Fifth Third to communicate further, DHIP's creditor, Centre,  which is majority owned and controlled by Sanlam (the affiliated loan guarantor), issued a loan demand for payment, stating that it would exercise its full right to collect owed monies if the loan remained unpaid by August 19, 2013.

114.   On August 16, 2013 Fifth Third's Mr. Schrank informed Mr. Robinson by text message that Fifth Third would not provide the promised RLOC to DHIP.

115.    Thus, the fully collateralized RLOC that was "done" earlier in the week was now somehow undone, and disapproved.

116.    By this time, it was too late for DHIP to reach out to another bank to obtain funding by the August 19, 2013 collection deadline on the prior loan, the reputations of DHIP and its then-members with the Funds' Board of Trustees had been irreparably harmed and DHIP was now unable to maintain its status of good standing with regard to the nature, extent, and quality of services on its existing advisory contract to the Funds it managed which would result in the termination of its investment advisory agreement with the Funds and loss of all of its revenue.

### Consequences of Fifth Third's Conduct

117.    Upon learning that Fifth Third had reneged on its promises, Abate and the loan guarantor (Sanlam) immediately withdrew their cash collateral deposited at Fifth Third.

118.    However, the damage to DHIP was irreparable.

119.    The loss of the expected $900,000 RLOC left DHIP short of working capital, unable to meet Centre's August 19 deadline to retire its past-due older debt, and unable to meet its commitments as the investment adviser to the Board of Trustees of the Funds for growth in the Funds (e.g., employment of other disabled veterans, preparation for launch of a new fund series and share classes to complement the existing Funds, and other actions that were put in place based upon Fifth Third Bank's commitment to DHIP).

120.    Because it could no longer retire the older debt as it had promised to do, and could not meet ongoing and new growth capital commitments, DHIP became nearly insolvent, unable to continue as a going concern and incapable of further growth.

121.    On September 13, 2013 the Funds' Board of Trustees terminated DHIP as the investment adviser to the Funds it managed, principally because of its inability to continue as a

going concern and execute on its commitments for growth due to Fifth Third Bank's failure to honor its commitment to DHIP.

122.    The stripping of DHIP's mutual fund investment advisory contract resulted in the loss of all DHIP's assets under management.

123.    Unable to retire its past due debt, unable to continue as a going concern and consequently stripped of its advisory business, effective September 14, 2013 Sanlam requested that DHIP's then-members sell their membership interests for a nominal payment to Centre, the creditor of its existing debt, pursuant to the terms as expressed in the Sanlam Agreement.  As described above, the creditor had previously agreed to a period of forbearance with DHIP based on Fifth Third's representations that the RLOC was imminent.

124.    DHIP's then-members received only nominal consideration for their membership interests in DHIP after its termination by the mutual fund Board of Trustees and loss of all of its assets under management.

125.    DHIP therefore lost its position as the first Service Disabled Veteran Small Business investment management firm managing a series of registered mutual funds with assets over $200 million in management from institutions and other investors.

126.    Given the lead time necessary to become an SEC registered investment adviser, build the investment management infrastructure, launch products, raise assets, and establish a track record, it would be impossible to become a first mover in this area again.

127.    Furthermore, DHIP's charter was to work to benefit the community of service-disabled veterans by recruiting, hiring and training disabled military veterans, such as Mr. Robinson, whenever possible, for careers in investment management.

128.    Given DHIP's destruction, Fifth Third Bank has denied it the opportunity to hire additional disabled-veterans attempting to transition to the investment management industry.

129.    DHIP has lost all of the funds it had under management and has been de-registered with the SEC.

130.    Thus, a rapidly growing business enterprise was put out of existence by Fifth Third's conduct.

131.    As a consequence of Fifth Third's broken promises, DHIP was totally and permanently impaired and its then-members lost their membership interests in DHIP, and therefore all of their shares in DHIP, which had an indicated fair market value of approximately $17.5 million and as high as $50.1 million.

132.    DHIP and its then-members' reputations within the investment management business have been damaged by DHIP's termination as the investment adviser to the funds.

## FIRST CAUSE OF ACTION
### (Promissory Estoppel)

133.    DHIP repeats and realleges each and every allegation set forth above as if fully set forth herein.

134.    Defendant Fifth Third and/or its personnel made clear and unambiguous promises to DHIP, including but not limited to that: (a) "legal is complete, closing is imminent based on credit telling doc team to release," that (b) "[c]redit was waiting on legal so this is done," (c) they were interested in developing a long-term relationship with DHIP, (d) that it wanted to showcase DHIP as a "marquee client" for their veteran's initiative and establish a "Mentor-Protégé" relationship with DHIP, (e) at an early stage, that Mr. Schrank had about 80% informal approval from Fifth Third's office of financial institutions for an unsecured RLOC, (f) Fifth Third was "committed" to DHIP, (g) that with the 100% full cash collateral Fifth Third requested, the loan

was a "slam dunk" (h) there was no approval risk for the loan because Fifth Third was "not underwriting based on performance" since it had full collateral, (i) Mr. O'Connell would send the documents for Mr. Abate to review "shortly," (j) the loan "should be wrapped up this week," (k) to "[s]tay tuned, we should have the docs shortly," (l) "[w]e are close [with the documents]. All hands are on deck to get them out the door," (m) Mr. O'Connell would "email . . . the doc for signature," and that "we can close and fund with electronic copies," and, (n) in convincing DHIP not to pursue a loan with JP Morgan or any other bank, that Fifth Third would showcase DHIP as the principal military veteran-owned business partner under Fifth Third's "Diversity Blueprint" and community support programs.

135.    DHIP reasonably and foreseeably relied on the aforesaid promises by Defendant Fifth Third by, among other things, (a) terminating discussions with another bank and not seeking financing from any other source; (b) entering into an agreement with Sanlam under which DHIP's then-members granted Sanlam the option to purchase their membership interests in DHIP for nominal payment in the event of a default event, in exchange for Sanlam providing $600,000 of cash collateral to support the loan promised by Fifth Third; (c) in the case of Mr. Abate, personally providing collateral for the RLOC; and (d) presenting to the Funds' Board of Directors their growth plan and their ability to execute on it, as well as the benefits promised by Fifth Third.

136.    Fifth Third knew or reasonably should have known that DHIP and its then-members took or were taking the above actions in reliance on Fifth Third's statements and promises.

137.    Fifth Third breached its promises, including but not limited to those set forth above.

138.    Fifth Third violated a duty it owed to DHIP having its origin in circumstances independent of and extrinsic to any duty owed to DHIP.

139.    As a consequence of its reasonable reliance on Fifth Third's promises, DHIP's business was totally and permanently impaired, as, among other things, it lost all of the funds it had under management and was then unable to conduct business as a registered investment adviser (with the SEC).

140.    DHIP personally suffered unique injuries including but not limited to the loss of their membership interests in DHIP, harm to their professional reputations and loss of partner distributions.

141.    DHIP was harmed in an amount to be determined at trial, but in no event less than $17.5 million.

**SECOND CAUSE OF ACTION**
**(Fraud)**

142.    DHIP repeats and realleges each and every allegation set forth above as if fully set forth herein.

143.    As set forth above, from March to August 2013, defendant Fifth Third and/or its agents or personnel made intentional and material misrepresentations of existing fact to DHIP, which Fifth Third intend to cause – and did cause – DHIP to the believe that RLOC would be approved an funded imminently and which were intended to cause – and did cause – DHIP to forgo seeking financing from any other lender.  These misrepresentations included,  but were not limited to: (a) that "legal is complete, closing is imminent based on credit telling doc team to release," that (b) "[c]redit was waiting on legal so this is done, (c) they were interested in developing a long-term relationship with DHIP, (d) at an early stage, that Mr. Schrank had about 80% informal approval from Fifth Third's office of financial institutions for an unsecured RLOC, (e)  that Fifth Third was "committed" to DHIP, (f) that the RLOC went into processing on April 25 and that it would be approved and closed within one week; (g) that there was no approval risk for the loan

26

because Fifth Third was "not underwriting based on performance" since they had full collateral, (h) that Mr. O'Connell would send the documents for Mr. Abate to review "shortly," (i) the loan was "bumped to the front of the line" and "should be wrapped up this week," (j) to "[s]tay tuned, we should have the docs shortly," (k) that "[w]e are close [with the documents]. All hands are on deck to get them out the door," and (l) Mr. O'Connell would "email . . . the doc for signature," and that "we can close and fund with electronic copies," and, (m) in convincing DHIP not to pursue a loan with another bank, that Fifth Third would showcase DHIP as the principal military veteran-owned business partner under Fifth Third's "Diversity Blueprint" and community support programs.

144.    Upon information and belief, defendant Fifth Third and/or its agents or personnel made these misrepresentations knowingly or recklessly, with intent to induce reliance thereon by DHIP.

145.    In order to prevent discovery of its misrepresentations, Fifth Third also actively hid from DHIP its internal conversations that painted a very different picture of the status of the RLOC and the chances that it would be funded, despite all of Fifth Third's protestations to the contrary. Specifically, among other things, Fifth Third hid that (a) on June 3, 2013 Mr. O'Connell was not sure he wanted to work with DHIP and on June 17 he had already "passed" on the deal twice; (b) on July 10, 2013 Mr. O'Connell was going to end the "charade" and inform DHIP that Fifth Third was not interested in working with them; (c) on July 11, Mr. Doyle was "out" on the loan; (d) the veterans' initiative that Mr. Schrank touted on July 25 simply did not exist; (e) on July 30 Mr. Terborg was told that there was "no way" the RLOC could be completed that day and that the credit officer had "no idea" if Ms. Huffman would approve it and that the application had been assigned a PD 11 and did not cash flow; (f) on August 8 Mr. O'Connell did not even know if MS.

Huffman had input her comments; (g) on August 9 that Mr. Doyle was "just ready to move on with no from here: and that expectations were supposed to be reset  that documents were a week away"; and (h) on August 12 or later that Fifth Third was concerned that the Sanlam pledge indicated a risk of a potential claim of fraudulent conveyance.

146.    DHIP justifiably and reasonably relied on Fifth Third's misrepresentations, including but not limited to by (a) limiting its application for financing to Fifth Third for more than five months, (b) terminating its discussions with JP Morgan  seeking alternate financing (c) presenting to the Funds' Board of Directors their growth plan and their ability to execute on it, as well as the benefits promised by Fifth Third, and (d) pledging and causing Sanlam to pledge an aggregate of $900,000 to collateralize the loan as Fifth Third required.

147.    DHIP suffered unique actual, consequential, and special damages, including damages separate and apart from those recoverable as contract damages, as a result of their reliance on Defendant's misrepresentations, including the loss of DHIP's entire business.

148.    DHIP was harmed in an amount to be determined at trial, plus punitive damages.

## THIRD CAUSE OF ACTION
### (Breach of Contract)

149.    DHIP repeats and realleges each and every allegation set forth above as if fully set forth herein.

150.    DHIP and Fifth Third entered into a valid and binding oral contract to enter into a loan agreement, defining the amount, term, interest rate, and provisions for repayment of the RLOC, as well as for providing the cash collateral to secure it. Fifth Third then represented that the deal was "done."

151.    On July 26 and July 29, 2013, DHIP caused the collateral to be deposited at Fifth Third, $300,000 by Mr. Abate and $600,000 from Sanlam (which provided the collateral in exchange for an option to acquire DHIP's then-members' equity interests in DHIP for nominal consideration upon an event of default).

152.    At all times relevant to this Complaint, DHIP satisfactorily completed its obligations under the loan agreement by, among other things, providing all information requested by Fifth Third and depositing full collateral for the loan.

153.    At all times relevant to this Complaint, DHIP was ready, willing and able to continue performance under the agreement.

154.    Fifth Third willfully violated the loan agreement by failing to issue the RLOC to DHIP according to the parties' agreement.

155.    Fifth Third knew that DHIP needed a loan imminently and that its business would suffer damage if its obligation to lend money was breached.

156.    Fifth Third's failure to issue the RLOC to DHIP constituted a breach of the loan agreement.

157.    DHIP was harmed by Fifth Third's breach of the agreement as set forth above, and suffered direct, proximate, actual, consequential and special damages including the loss of their membership interests in DHIP, harm to their professional reputations and loss of partner distributions

158.    DHIP was harmed in an amount to be determined at trial, but in no event less than $17.5 million.

## <u>FOURTH CAUSE OF ACTION</u>
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

159.    DHIP repeats and realleges each and every allegation set forth above as if fully set forth herein.

160.    DHIP and Fifth Third entered into a valid and binding oral contract to enter into a loan agreement for the RLOC.

161.    Implied in all contracts, including the loan agreement, is a covenant of good faith and fair dealing which is breached when a party to the contract acts in a manner that, although not constituting a breach of the contract, deprived the other party to the contract of the right to receive the benefits of the agreement.

162.    At all times relevant to this Complaint, DHIP performed satisfactorily its obligations under the loan agreement.

163.    At all times relevant to this Complaint, DHIP was ready, willing and able to continue performance under the loan agreement.

164.    Fifth Third repeatedly represented that the RLOC was close to being issued, that closing documents were imminent, they required DHIP's then-members to provide 100 percent cash collateral as Fifth Third's delay caused the situation to become more dire, and assured DHIP that this collateralization would make their loan a "slam dunk."  Finally, Fifth Third represented that the deal was "done," but then cut off communication and texted Mr. Robinson that the RLOC would not be issued.  These actions by Fifth Third were in bad faith and in breach of the obligation to act in good faith.

165.    As a direct result of Fifth Third's bad-faith actions in stringing along DHIP to its detriment and then backing out of its commitment, Fifth Third breached the implied covenant of good faith and fair dealing.

166.   Fifth Third's breach of the covenant of good faith and fair dealing was the proximate cause of the destruction of DHIP.

167.   DHIP was harmed in an amount to be determined at trial, but in no event less than $17.5 million.

**WHEREFORE**, DHIP respectfully demands judgment as follows:

a.   On the First Cause of Action, an award in an amount to be determined at trial, but in no event less than $17.5 million plus interest and consequential damages;

b.   On the Second Cause of Action, an award in an amount to be determined at trial, plus interest, consequential and punitive damages;

c.   On the Third Cause of Action, an award in an amount to be determined at trial, but in no event less than $17.5 million plus interest and consequential damages;

d.   On the Fourth Cause of Action, an award in an amount to be determined at trial, but in no event less than $17.5 million plus interest and consequential damages;

e.   Special and punitive damages;

f.   Awarding DHIP such other and further relief as the Court may deem necessary, just or appropriate.

Dated: New York, New York
       March 6, 2019

DUNNING RIEVMAN & DAVIES LLP


By:   /s/ Joshua D. Rievman
      Joshua D. Rievman
      Michael G. Davies
434 W. 33rd Street
New York, New York 10001
Telephone: (646) 434-0027
*Attorneys for Plaintiff DHIP, LLC*